David MILLER, et al., Plaintiffs,

v.

PACIFIC SHORE FUNDING, et al., Defendants.

No. 02–CV–569.

United States District Court,
D. Maryland,
Northern Division.

May 17, 2002.

■■■■■■■■■■■■■■■■■■■■■■■

Fred Thompson, Daniel O. Myers, Kevin Oufnac, A. Hoyt Rowell, III, Ness Motley PA, Mt. Pleasant, SC, Joseph Christopher Garland, Law Offices of Joseph C. Garland, Towson, MD, Edwin David Hoskins, The Law Offices of E. David Hoskins LLC, Baltimore, MD, for plaintiffs.

Leah Schmulewitz Getlan, Cynthia G. Swann, Weiner, Brodsky, Sidman, Kider PC, Washington, DC, Philip M. Andrews, Kramon and Graham, Gerard J. Gaeng, Rosenberg, Proutt Funk and Greenberg LLP, Lee Scott Kaminetz, Craig L. McCullough, Rosenberg, Proutt Funk and Greenberg, LLP, Baltimore, MD, James W. Bentz, Roy W. Arnold, Thomas L. Allen, John M. McIntyre, Reed Smith LLP, Pittsburgh, PA, Russel J. Pope, Pope and Hughes PA, Towson, MD, John Henry Lewin, Jr., Venable Baetjer and Howard LLP, Baltimore, MD, Denise Esposito, Thomas Julian Page, Daniel H. Squire, Wilmer, Cutler and Pickering, Daniel Joseph Tobin, Kirkpatrick and Lockhart LLP, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

SMALKIN, Chief Judge.

This matter comes before the Court on motions to dismiss for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, filed by the defendants Amaximis Lending, L.P. ("Amaximis"), GMAC–Residential Funding Corp. ("Residential"), Homeq Servicing Corp. (f/k/a TMS Mortgage, Inc.) ("Homeq"), Banc One Financial Services, Inc. ("Banc One"), MBNA America (Delaware), N.A. ("MBNA"), Household Finance Corp. ("Household"), and Bankers Trust Co. of California, N.A. ("Bankers Trust"). Also before the Court is a motion to dismiss for failure to state a claim upon which relief can be granted filed by the defendant Pacific Shore Funding ("Pacific"). All of the defendants are non-Maryland entities. The Plaintiffs, David and Rosalie Miller ("the Millers") and Chima Gilbert–Iheme ("Mr.Gilbert–Iheme"), all citizens of Maryland, are seeking relief for themselves (and others similarly situated) for violations of Maryland law governing the making of secondary mortgage loans. The issues have been fully briefed by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

## BACKGROUND

The Millers and Mr. Gilbert–Iheme filed this putative class action in the Circuit Court for Baltimore City on January 16, 2002. The case was timely removed to this Court on February 21, 2002. The plaintiffs assert three counts against the eight defendants: Count I—violations of the Maryland Secondary Mortgage Loan Law ("SMLL"), Md.Code Ann., Com.Law II §§ 12–401 through –415 (1975, 2000 Repl.Vol & Supp.2001); Count II—violations of the Maryland Consumer Protection Act ("CPA"), *Id.* §§ 13–101 through –501; and Count III—the formation and performance of "illegal contracts." As remedy for the third count, they seek a declaratory judgment that their loan agreements are void or voidable as contracts against the public policy of Maryland.

The gravamen of their claims is that Pacific charged and collected excessive or unauthorized fees in conjunction with loans that were secured by junior mortgages on their residences. They have sued the other seven defendants solely as subsequent purchasers, assignees, or holders of these loans—or of secondary mortgage loans

that Pacific made to others as yet unidentified.

▮▮▮ Putative class representatives David and Rosalie Miller allege that Pacific made a loan to them on February 2, 2000, which was secured by a secondary mortgage on their residence. The principal amount of the loan was $35,000, with a term of twenty years, an interest rate of 13.750%, and an effective annual interest rate of 15.764%. At closing, the Millers allege they were charged the following fees: (1) a loan origination fee of $2,450; (2) a funding fee of $195; (3) a processing fee of $295; (4) an express mail fee of $15; (5) a signing fee of $150; (6) a sub-escrow fee of $350; (7) prepaid interest of $303.14; (8) a title exam fee of $150; (9) recording fees of $25; and (10) a flood certification fee of $18.[1] Sometime thereafter, Residential took an assignment of the loan.

Putative class representative Chima Gilbert–Iheme alleges that Pacific made a loan to him on October 13, 1998, which was secured by a secondary mortgage on his residence. The principal amount of the loan was $48,000, with a term of twenty years, an interest rate of 12.500%, and an effective annual interest rate of 14.277%. At closing, Mr. Gilbert–Iheme alleges he was charged the following fees: (1) an appraisal fee of $75; (2) a credit report fee of $6; (3) a funding fee of $175; (4) a processing fee of $275; (5) a messenger/state tax fee of $415; (6) a document signing fee of $125; (7) a sub-escrow fee of $200; (8) prepaid interest of $328.80; (9) a title exam fee of $150; (10) a document preparation fee of $25; (11) a flood certification fee of $17; and (12) recording fees of $220. The pleadings do not disclose whether Mr. Gilbert–Iheme was also charged a separate "loan origination" fee. Sometime thereafter, MBNA and Household took assignments of the loan.

In connection with their loans, the plaintiffs also allege: that Pacific made false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading Maryland consumers; and that Pacific knowingly concealed, suppressed, or failed to state material facts.

### A. Defendant Pacific
### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41,

---

1. In fact, the Millers' complaint neglects to mention the "loan origination" fee and the "flood certification" fee. It also claims that the recording fees amounted to $43. Compl. ¶ 29. The Millers did not append to their complaint any documentation underlying their allegations. Pacific, however, has introduced into its motion to dismiss a copy of the "HUD–1 Settlement Statement"—seen and signed by the Millers at closing—which serves as the basis of the their complaint and sets out all the fees they were charged. Pacific Reply, Ex. C. Because the Millers have relied upon this document in bringing suit, the Court has considered it part of the pleadings in resolving the defendants' motions to dismiss. See Fed.R.Civ.P. 10(c); New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am., 18 F.3d 1161, 1164 (4th Cir. 1994) (citing Cortec Indus. v. Sum Holding L.P., 949 F.2d 42, 47–48 (2d Cir.1991) (deeming a complaint "to include ... any statements or documents incorporated in it by reference" and permitting a defendant to produce such materials when attacking the complaint)). Moreover, when the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail. Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir.1991). The "HUD–1 Settlement Statement" discloses the two unmentioned fees and only $25 in recording fees. Therefore, it supplements and trumps the allegations as stated in the Millers' complaint.

45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss under Rule 12(b)(6), a court must accept the allegations contained in the complaint as true. *See DeBauche v. Trani,* 191 F.3d 499, 505 (4th Cir.1999) (citing *Conley,* 355 U.S. at 47–48, 78 S.Ct. 99). The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Otherwise, "Rule 12(b)(6) would serve no function, for its purpose is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint." *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1086 (4th Cir.1979); *see also Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994) (reiterating that a plaintiff's legal conclusions merit no deference in deciding a motion to dismiss).

## ANALYSIS

### 1. *Plaintiff Gilbert–Iheme*

■ When it appears on the face of the complaint that the limitation period has run, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss. *United States v. Westvaco Corp.,* 144 F.Supp.2d 439, 441–42 (D.Md.2001); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 348–54 (2d ed.1990). In this action based on federal diversity jurisdiction, the Court applies the Maryland statute of limitations, *Hartnett v. Schering Corp.,* 806 F.Supp. 1231, 1233–34 (D.Md.1992), *aff'd* 2 F.3d 90 (4th Cir. 1993), as well as Maryland law construing it, *Wade v. Danek Med., Inc.,* 182 F.3d 281, 289 (4th Cir.1999).

■ Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. Md. Code Ann., Cts. & Jud.Proc. § 5–101 (1974, 1998 Repl.Vol.). Mr. Gilbert–Iheme asserts three causes of action against Pacific: violation of the SMLL, violation of the CPA, and "illegal contract." The Code does not provide a different period of time within which any of these actions must be commenced. Thus all of Mr. Gilbert–Iheme's claims are subject to the general three-year statute of limitations. *See Williams v. Standard Fed. Sav. & Loan Ass'n,* 76 Md.App. 452, 456–64, 545 A.2d 708 (1988) (rejecting argument that the one-year limitations period governing any "suit for a fine, penalty, or forfeiture," Md.Code Ann., Cts. & Jud.Proc. § 5–107, applies to claims brought under the SMLL and applying instead the general three-year statute of limitations); *Greene Tree Home Owners Ass'n v. Greene Tree Assocs.,* 358 Md. 453, 480, 749 A.2d 806 (2000) (holding that the three-year statute of limitation applies to claims based on the CPA).

■ The question of accrual is left to judicial determination, which "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute [of limitations] and the facts to which it is applied."[2] *Frederick Rd. Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 95, 756 A.2d 963 (2000). If there is no genuine issue of material fact regarding the accrual of a cause of action, a court may determine the date of accrual as a matter of law. *O'Hara v. Kovens,* 305 Md. 280, 300, 503 A.2d 1313 (1986); *Edwards v.*

2. The Maryland Court of Appeals has articulated at least three purposes behind the state's limitations period: (1) "to assure fairness to a potential defendant by providing a certain degree of repose"; (2) "to prevent unfairness to potential plaintiffs exercising reasonable diligence in pursuing a claim"; and (3) "to promote judicial economy." *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020 (1983).

*Demedis,* 118 Md.App. 541, 553, 703 A.2d 240 (1997). Statutes of limitations, moreover, are to be strictly construed; implied and equitable exceptions are frowned upon. *See Walko Corp. v. Burger Chef Sys., Inc.,* 281 Md. 207, 211, 378 A.2d 1100 (1977); *McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 160, 40 A.2d 313 (1944) (counseling that courts "should refuse to give statutes of limitations a strained construction to evade their effect").

■ Nevertheless, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," the Maryland Court of Appeals has adopted the "discovery rule" to determine the date of accrual. *Frederick Rd. Ltd. P'ship,* 360 Md. at 95, 756 A.2d 963. Under the discovery rule, the statute of limitations does not begin to run "until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury." *Id.* at 95–96, 756 A.2d 963. Thus, a cause of action accrues when: (1) the legally operative facts permitting the filing of a claim come into existence; and (2) the claimant has notice of the nature and cause of his or her injury. *Heron v. Strader,* 361 Md. 258, 264, 761 A.2d 56 (2000); *Frederick Rd. Ltd. P'ship,* 360 Md. at 96, 756 A.2d 963; *Edwards,* 118 Md.App. at 566, 703 A.2d 240; *see also O'Hara,* 305 Md. at 302, 503 A.2d 1313 (defining notice as "knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[ ] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [wrong]").

■ Mr. Gilbert–Iheme obtained the allegedly illegal loan from Pacific on October 13, 1998. On that date, "[a]t closing," Compl. ¶ 31, he was charged all of the fees and expenses of which he complains.

Therefore, that is the date on which "the legally operative facts permitting the filing of [his] claims came into existence." *Heron,* 361 Md. at 264, 761 A.2d 56. Furthermore, the charges were all expressly identified in the closing documents. At closing, therefore, Mr. Gilbert–Iheme also appears to have had sufficient knowledge of circumstances indicating he might have been harmed. *See O'Hara,* 305 Md. at 302, 503 A.2d 1313. Despite this knowledge, he waited until January 16, 2002, more than three years after closing the loan, to file his suit. Still, Mr. Gilbert–Iheme advances three arguments why his claims are not time-barred, the first two invoking the discovery rule, the third characterizing the statutory violation as recurrent.

■ He argues first that he did not discover the legal basis for his claims until September 25, 2001. Pl.Opp. 17. Knowledge of *facts,* however, not actual knowledge of their legal significance, starts the statute of limitations running. *See Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 447–47, 749 A.2d 796 (2000) (emphasizing the factual nature of the requisite knowledge); *Doe v. Archdiocese of Washington,* 114 Md.App. 169, 183–86, 689 A.2d 634 (1997) (explaining that a cause of action in tort generally accrues at the same time the act that constitutes the tort occurs—regardless whether the victim recognizes the act as legally wrong or comprehends the full extent of the harm). The discovery rule, in other words, applies to discovery of *facts,* not to discovery of *law.* Knowledge of the law is presumed. *See, e.g., Post v. Bregman,* 349 Md. 142, 156, 707 A.2d 806 (1998) (noting that "parties to a contract are deemed to have contracted with knowledge of existing law"). Ignorance of the rights it grants and protects does not toll the statute of

limitations.[3] If plaintiffs remain unaware of their legal rights after notice of injury, the statute of limitations sets an absolute deadline for gaining awareness. A plaintiff must exercise reasonable diligence— defined by the limitations period—"in determining whether ... particular acts or omissions causing injury are actionable in court." *Capital Dist. Physician's Health Plan v. O'Higgins*, 939 F.Supp. 992, 1000 (N.D.N.Y.1996).

■ Second, Mr. Gilbert–Iheme argues that Pacific somehow fraudulently covered up what it had done and so delayed his discovery of the harm. Certainly, when a defendant's "stealth [or] subterfuge ... leave[s] a plaintiff 'blamelessly ignorant' of the facts and circumstances legally entitling him or her to relief," the discovery rule prevents the limitations clock from running until the plaintiff has learned or should have learned of the fraud. *Murphy v. Merzbacher*, 346 Md. 525, 532, 697 A.2d 861 (1997); *see also Edwards*, 118 Md.App. at 566, 703 A.2d 240 (noting that "fraud

may prevent the acquisition of knowledge sufficient to constitute inquiry notice or prevent the acquisition of additional information if inquiry is made"); Md.Code Ann., Cts. & Jud.Proc. § 5–203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."). Because the fraud at issue here also constitutes the substance of Mr. Gilbert–Iheme's CPA claim, he can invoke the discovery rule to toll the statute of limitations only if he has stated a claim under the CPA.

■ The CPA prohibits "any unfair or deceptive trade practice" in "[t]he extension of consumer credit." Md.Code Ann., Com.Law II § 13–303. "Unfair or deceptive trade practices" include any "[f]alse ... or misleading oral or written statement ... which has the capacity, tendency, or effect of deceiving or misleading con-

3. Maryland courts have been less express than others in their reliance on this axiomatic principle. *See, e.g., Lynch v. Dial Fin. Co. of Ohio No. 1, Inc.*, 101 Ohio App.3d 742, 656 N.E.2d 714, 718 (1995) (stating that the discovery rule applies "to the discovery of *facts*, not to the discovery of what the *law* requires"). There can be no doubt, however, that the law of Maryland recognizes it. Its effect is felt, for example, in *Poffenberger v. Risser*, the case credited with extending the discovery rule to all actions at law. 290 Md. 631, 431 A.2d 677 (1981). The plaintiff there purchased land in a planned development and contracted with the defendant to build a house on the property in compliance with all restrictions. *Id.* at 632–33, 431 A.2d 677. One of the restrictions, enumerated on the recorded plat of the subdivision, directed that no portion of a building could be located within fifteen feet of any other side lot line. *Id.* at 633, 431 A.2d 677. The defendant completed construction in 1972. *Id.* Four years later, an adjoining parcel was surveyed, and the plaintiff discovered that part of his house rested within the restricted setback.

*Id.* Only then did the plaintiff bring suit. *Id.* Although the defendant argued that the plaintiff's cause of action accrued, at the latest, upon completion of construction, and the plaintiff argued instead that his cause did not accrue until the 1976 survey, both parties (and the court) assumed that the plaintiff had known the law—that no building could encroach within fifteen feet of a side lot—from the date of purchase. *Id.* at 636–38, 431 A.2d 677. The sole question, answered in favor of the plaintiff, *id.* at 638, 431 A.2d 677, addressed whether the plaintiff had sufficient notice of the *facts* of encroachment in 1972 or in 1976. Indeed, application of the discovery rule to belated discovery of the law would defeat the threefold purpose of the statute of limitations, *see supra* note 2. Plaintiffs could preserve their claims indefinitely, delaying the start of the limitations period until they decided to seek legal advice. *Cf. Doe*, 114 Md.App. at 183, 689 A.2d 634 (refusing to put plaintiffs "in subjective control of the limitations period") (quoting *Travis v. Ziter*, 681 So.2d 1348, 1355 (Ala.1996)) (internal quotation marks omitted).

sumers," *id.* § 13–301(1), as well as any "[f]ailure to state a material fact if the failure deceives or tends to deceive," *id.* § 13–301(3).[4] Mr. Gilbert–Iheme contends that Pacific both misrepresented and suppressed a material fact.

He maintains that the very communication of the allegedly illegal charges deceived him into believing that the charges were legal. Pl.Opp. 22. The charges themselves, he urges, affirmatively misrepresent their illegality. Expressly, of course, the statement of a monetary charge says nothing whatsoever about the lawfulness of the underlying transaction. Nevertheless, "[f]or consumer protection purposes, the meaning of any statement or representation is determined not only by what is explicitly stated, but also by what is reasonably implied." *Golt v. Phillips*, 308 Md. 1, 9, 517 A.2d 328 (1986). Thus, the advertisement and rental of a dwelling implicitly represents that the landlord has the proper licensing and that the lease is lawful. *Id.* A potential tenant, reading the words "Apartment for Rent" would reasonably conclude that the advertising landlord is legally authorized to rent the apartment. If the landlord is not so authorized, the advertisement is misleading and its publication violates the CPA. *Id.* But does a statement of charges by a lender reason-

ably imply that the charges are permitted by law? The Court thinks not.

The landlord in *Golt* implicitly represented that it had the legal *right* to contract (insofar as a landlord-tenant relationship may be considered contractual); it made no representation, express or implied, about the legality of the *terms* of the contract. The advertisement, that is, implied that the advertiser had the right to enter into a landlord-tenant relationship involving the advertised premises. Arguably too, the settlement statement listing the disputed fees, which Pacific provided Mr. Gilbert–Iheme at closing, implied that Pacific had the right to enter into a lender-borrower relationship involving a loan secured by a secondary mortgage. If so, Pacific spoke the truth: Pacific *was* licensed to extend such a loan to consumers in Maryland.[5] The settlement statement cannot reasonably imply, however, that the specific terms of the contract—the various listed charges—conformed with the law. To read *Golt* otherwise would lead to absurd results, not clearly contemplated by the Maryland legislature. Bookies, for example, routinely tell gamblers how much they stand to win (in terms of the quoted odds). Only a fool more foolish than most gamblers would believe the odds they are quoted vouch for the legality of the wager.

---

**4.** "Unfair or deceptive trade practices" also include "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact" in connection with the promotion or sale of consumer goods, realty, or services, a contract relating to an invention, or the subsequent performance of a merchant with respect to an agreement of sale, lease, or rental. Md.Code Ann., Com.Law II § 13–301(9). Although Mr. Gilbert–Iheme cites this subsection in support of his CPA claim, the Court fails to see how it applies to the making of mortgage-secured loans.

**5.** In accordance with Federal Rule of Evidence 201, upon request of Pacific, and after

providing the plaintiffs an opportunity to be heard on the matter, the Court takes judicial notice of Pacific's mortgage lender licenses, effective from January 1, 1998, through December 31, 1999, and from January 1, 2000, through December 31, 2001, issued and on file with the Maryland Department of Labor, Licensing and Regulation, Division of Financial Regulation. Pacific Reply, Ex. E. The Court has considered both the plaintiffs' arguments on the matter as well as Pacific's response thereto. Although the plaintiffs allege that Pacific *misused* its license by failing to comply with the relevant licensing provisions, *see infra*, misuse does not alter the fact that Pacific possessed a license.

And while bookies may violate a congeries of laws by taking bets, they do not also commit fraud by obtaining money for their services.

■ Mr. Gilbert–Iheme also argues that Pacific violated the CPA by failing to state "the material fact that [his] loan was governed by the SMLL." Pl.Opp. 22–23. An omission is deemed material "if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Golt,* 308 Md. at 10, 517 A.2d 328. The landlord in *Golt* failed to disclose the fact that he lacked proper licensing to rent the apartment at issue. *Id.* The Maryland Court of Appeals found the landlord's omission material because "the lack of proper licensing for an apartment under most circumstances is a . . . fact that any tenant would find important in [determining] whether to sign a lease agreement and move into the premises." *Id.*

■ The material "fact" that Mr. Gilbert–Iheme claims Pacific suppressed, however, is not fact at all—it is material *law.* And the failure to state a material law is a failure to state a material *fact* only if the law requires that the law be stated. The SMLL requires such disclosure if the loan is to be used for commercial purposes; more precisely, it obligates lenders to notify borrowers of the rights they will forfeit under the SMLL if they indicate that they intend to use the proceeds of the loan for a commercial purpose. Md.Code Ann., Com. Law II § 12–407.1(a)(2); Pl.Opp., Ex. 1. The notice lenders must furnish is a form developed by the Maryland Commissioner of Financial Regulation. Md.Code Ann., Com.Law II § 12–407.1(a); Pl.Opp., Ex. 1. If the loan is not to be used for commercial purposes, the lender has no obligation to disclose the rights that the borrower is not forfeiting. Mr. Gilbert–Iheme does not—and cannot—allege that his loan was used for commercial purposes. Therefore, Pacif-ic's failure to disclose his rights under the SMLL does not constitute a failure to disclose a material fact, and Mr. Gilbert–Iheme has failed to state a claim that Pacific violated the CPA. Moreover, because he alleges no other deceptive behavior that would retard his discovery of the facts and circumstances enabling him to file suit, his second argument why his claims are not time-barred likewise fails.

■ His third and final argument depends not on the discovery rule, but on the nature of the alleged SMLL violation, or rather, the number of alleged SMLL violations. He contends that a new and actionable violation of the SMLL occurs each month when he pays his mortgage bill. Pl.Opp. 8, 17. Thus, even if the statute of limitations bars his claims prior to January 16, 1999, claims subsequent to that date survive, he contends. *Id.* at 17, 517 A.2d 328.

The SMLL prohibits a lender not only from "contract[ing] for" fees in excess of those permitted, Md.Code Ann., Com.Law II § 12–411, but also from "charg[ing]," "receiv[ing]" or "collect[ing]" such fees, *id.* §§ 12–405(a)(3), 12–411. At closing, Mr. Gilbert–Iheme paid none of the fees assessed by Pacific. Pl.Opp. 8; *cf.* Pacific Reply, Ex. C (indicating that the Millers likewise paid no fees at closing). Instead, the fees were included in the total indebtedness on the loan. Pl.Opp. 8; *cf.* Pacific Reply, Ex. C. Under such circumstances, each time a borrower makes a mortgage payment, part of the payment represents the allegedly unlawful fees imposed at origination. With each monthly mortgage bill, then, Mr. Gilbert–Iheme reasons, Pacific (or the current holder of the note) newly charges illegal fees; and with each monthly payment by the borrower, Pacific (or the current holder of the note) newly receives and collects illegal fees.

The argument is ingenious, but flawed. The apparently punctuated charging, receipt, and collection are no more than the lingering, ongoing, continuing aspects of a unitary action initiated more than three years ago. If, as Mr. Gilbert–Iheme alleges, that action violates the SMLL, the violation has inflicted a single monetary injury whose amount increases steadily over time. "The wrong that continues over time," however, is "different from a wrong which comes into existence or becomes known only after a passage of time." *Edwards*, 118 Md.App. at 562, 703 A.2d 240.

At issue in *Edwards* was the date of accrual of a cause of action for legal malpractice. Conceding that their attorney had first negligently advised them well beyond the limitations period, the plaintiffs nevertheless argued that their claims were not time-barred, because the negligent advice continued throughout the course of representation, much of it within the limitations period. *Id.* at 551, 561, 703 A.2d 240. Each instance of negligent advising, they contended, was a discrete tort giving rise to a new cause of action. The Maryland Court of Special Appeals disagreed, finding instead that the alleged negligence was all of a piece and affirming the trial court's grant of summary judgment in favor of the defendant attorney. *Id.* at 562, 566, 703 A.2d 240. Once the plaintiffs acquired sufficient knowledge of the attorney's allegedly negligent advice and of their harm (which the court found had occurred outside the limitations period), the attorney's continued negligence was irrelevant. *Id.*

So, too, in the case of Mr. Gilbert–Iheme. More than three years before filing his suit, at the closing of the loan, Mr. Gilbert–Iheme had sufficient knowledge of circumstances indicating he might have been harmed. The allegedly illegal fees were itemized on the face of the loan documents he signed on that date. The continued charging, collecting, and receiving of those fees by the lender or its assignees do not continuously renew the accrual of his cause of action.[6] His claims are time-barred as a matter of law and must, therefore, be dismissed.

### 2. Plaintiffs David and Rosalie Miller

#### a. Secondary Mortqaqe Loan Law

The legislative scheme that regulates secondary mortgage loans in Maryland separates licensing from credit provisions. While the SMLL sets out the credit provisions, the Maryland Mortgage Lender

---

**6.** *Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 79 Md.App. 461, 558 A.2d 419 (1989), does not counsel otherwise. In *Singer Co.*, a computer software engineering company sued the defendant power company both *ex contractu* and *ex delicto* for damages resulting from numerous power interruptions over the course of three years. The trial court ruled that both causes of action accrued at the time of the initial power outage and barred the computer company's claims. *Id.* at 465–66, 558 A.2d 419. The appellate court vacated that ruling, finding that the power company owed continuing contract and tort duties to supply power and that each interruption represented a separate breach of those duties, giving rise to a separate cause of action. *Id.* at 472–77, 558 A.2d 419. It noted that each power outage caused the computer company to sustain distinct injuries from the corresponding incapacitation of its computers. *Id.* at 469, 558 A.2d 419. Thus, the computer company could maintain a suit for those claims accruing within the three-year period preceding the filing of the suit. *Id.* at 475, 476–77, 558 A.2d 419. All the "actions" that Mr. Gilbert–Iheme attributes to Pacific and its assignees, however, are but one *action*. The alleged statutory violation, though continuing, is solitary. "The wrong that continues over time" differs not only from "a wrong which comes into existence or becomes known only after a passage of time," but also from distinguishable *wrongs* that are perpetrated seriatim.

Law ("MLL"), Md.Code Ann., Fin.Inst. §§ 11–501 through –524 (1980, 1998 Repl. Vol. & Supp.2001), sets out the licensing provisions.[7] *See Pence v. Norwest Bank Minn., N.A.,* 363 Md. 267, 281–82, 768 A.2d 639 (2001); *Schmidt v. Beneficial Fin. Co. of Frederick,* 285 Md. 148, 150, 400 A.2d 1124 (1979). No one may make a secondary mortgage loan under the SMLL unless licensed or exempt from licensing under the MLL. Md.Code Ann., Com.Law II § 12–402. The Millers allege violations of both the licensing and credit provisions.

■ They allege that, in violation of the licensing provisions, Md.Code Ann., Fin.Inst. § 11–505, the documents relating to their second mortgage were executed at a location other than Pacific's licensed place of business, a title company, or an attorney's office. This Court has found, however, that the MLL itself does not grant plaintiffs a private right of action to redress a violation of section 11–505. *Staley v. Americorp Credit Corp.,* 164 F.Supp.2d 578, 579–82 (D.Md.2001). Instead, the MLL permits individuals to bring suit only against creditors that have no license at all. Md.Code Ann., Fin.Inst. § 11–523(b); *Staley,* 164 F.Supp.2d at 581 n. 2. Against licensed creditors that otherwise violate the licensing provisions, individuals must file their complaint with the Maryland Commissioner of Financial Regulation, who alone has the power to investigate and take remedial action. Md.Code Ann., Fin.Inst. §§ 11–515(b)(1), –517. Odd

it would be, if the credit provisions of the SMLL grant plaintiffs the very right that the licensing provisions of the MLL deny.

■ Indeed, the SMLL evinces no such incongruity. It explicitly limits private enforcement to actions against creditors that are either licensed or exempt from licensing under the MLL. Md.Code Ann., Com.Law II § 12–413 (restricting civil penalties to "lender[s]," statutorily defined as MLL licensees or persons exempt from licensing under the MLL, *id.* § 12–401(b), (c)). Moreover, to imply a private cause of action against either unlicensed creditors or licensed creditors that misuse their license would undo the largely administrative licensing regime established by the MLL. Licensing and licensing violations simply do not come within the purview of the credit-focused SMLL.

■ Effective October 1, 1998, the SMLL has authorized lenders to charge and collect an aggregate "loan origination fee" of no more than 10% of the "net proceeds" of the loan. Md.Code Ann., Com.Law II § 12–405(a)(1), (2). Above and beyond such a fee, lenders may also charge and collect "the fees paid to a public official or governmental agency for recording or satisfying the instrument securing the loan." *Id.* § 12–405(b). Lenders may not, however, "collect from the borrower[s] any other commission, finder's fee, or point for obtaining, procuring, or

---

7. Actually, the legislative scheme is somewhat more complex. The SMLL and MLL do not regulate all secondary mortgage transactions. Lenders may, at their option, elect instead to make secondary mortgage loans subject to the Credit Grantor Closed End Credit Provisions ("CECP"), Md.Code Ann., Com.Law II §§ 12–1001 through –1028 (1983, 2000 Repl.Vol. & Supp.2001). *Id.* § 12–1013.1(a)(1). If a lender expresses a CECP election in writing in the note, the provisions of the SMLL do not apply to the loan. *Id.* § 12–1013.1(a)(2), (b)(1); *Taylor v. Friedman,* 344 Md. 572, 579–80, 689

A.2d 59 (1997). If, on the other hand, a lender fails to make a valid election under the CECP, the SMLL governs. Md.Code Ann., Com.Law II § 12–1013.1(b)(2). The Millers have not indicated whether Pacific elected to extend their loan under the CECP; they simply allege that the SMLL applies. The Court, as it must, will accept their allegation as true. If, of course, there was an election under the CECP, and that fact appears in a properly supported motion for summary judgment, that allegation will fall by the wayside. Fed. R.Civ.P. 56(e).

placing a [SMLL] loan." *Id.* § 12–405(a)(3). Nor may they "directly or indirectly, contract for, charge, or receive, any interest, discount, fee, fine, commission, brokerage, charge, or other consideration in excess of that permitted by [the SMLL]." *Id.* § 12–411.

■ Because the Millers' loan closed on February 2, 2000, Compl. ¶ 28, Pacific was permitted to charge them a loan origination fee not exceeding $3,154.26 and, in addition, any expenses incurred for recording the mortgage.[8] Apart from the $25 recording fees that Pacific validly charged separately, Pacific charged the Millers eight individually denominated fees: a "loan origination fee," a "funding fee," a "processing fee," an "express mail fee," a "signing fee," a "sub-escrow fee," a "title exam fee," and a "flood certification fee."[9] Compl. ¶ 29; Pacific Reply, Ex. C. The "loan origination fee" of $2,450 obviously does not exceed $3,154.26. However, the other seven "non-interest," non-recording fees add up to $1,173. Either in whole or in part, this sum stands "in excess of that permitted by" the SMLL. Md.Code Ann., Com.Law II § 12–411. The Court therefore cannot say, as a matter of law, that the Millers have failed to state a claim upon which relief can be granted under the SMLL.

If the lender's own labels matter, the whole sum represents charges in excess of

---

8. The SMLL defines "net proceeds" as the difference between the full amount of the secondary mortgage loan and the amount of interest taken in advance on the loan plus the amount of the loan origination fee. Md.Code Ann., Com.Law II § 12–401(f). The Millers allege that the full amount of their loan was $35,000, and that the amount of interest taken in advance, *see infra* note 9, was $303.14. Compl. ¶ 29; Pacific Reply, Ex. C. If $x$ represents the maximum allowable loan origination fee, the net proceeds of the Millers' loan equals $35,000 − $303.14 − $x$, or $34,696.86 − $x$. Because $x$ may not exceed 10% of the net proceeds, the following equation arises: $x \leq 0.1 (\$34,696.86 − x)$. Simplification yields: $1.1x \leq \$3,469.686$. Solution discloses a maximum allowable loan origination fee of $3,154.26.

9. Although the Millers complain of the $303.14 in prepaid interest as a "fee," Compl. ¶ 29, under the SMLL it represents not a "fee," so-called, but rather the "amount of interest taken in advance on the loan." Md. Code Ann., Com.Law II § 12–401(f)(2). In defining "net proceeds," *see supra* note 8, the SMLL ventures to distinguish such prepaid "interest" from the loan origination "fee." Indeed, the SMLL ventures to distinguish "interest" from "fees" in general. *Compare* Md. Code Ann., Com.Law II § 12–404 (regulating "interest") *with id.* § 12–405 (regulating "charges" or "fees"). This is risky business, fraught with hermeneutic peril. Black's Law Dictionary defines "fee" as a "charge for labor or services." Black's Law Dictionary 629 (7th ed.1999). It defines "interest" as the "compensation fixed by agreement or allowed by law for the use or detention of money." *Id.* at 816. Does compensation for the use of money differ from a charge for the service of lending money? Quite likely, "even the most hair-splitting semantic debate" would fail to yield a meaningful distinction. *Thomison v. Long Beach Mortgage Co.*, 176 F.Supp.2d 714, 717 (W.D.Tex.2001). Commanded nevertheless by statute to hazard this sort of barbery, the Court, it seems, can do no more than take the lender's "word" that prepaid "interest" is "interest" and that, otherwise, a "fee" is a "fee." *See id.* at 717 n. 6 (recognizing the semantic and numeric games that lenders may play with these terms, limited, however, by statutory caps on each).

About the interest that Pacific has charged them, the Millers do not complain. Nor can they. The effective rate of simple interest on their loan, the "annual percentage rate" of 15.764%, does not exceed the 16% rate permitted by the SMLL. Md.Code Ann., Com. Law II § 12–404(b). (On loans made after July 1, 1982, with certain restrictions, the SMLL allows lenders to charge as much as a 24% rate of interest. *Id.* § 12–404(d). Pacific's loan to the Millers appears to fall within one of those restrictions. Inasmuch as Pacific contracted for, charged, and received a sum of interest in advance on the loan, it remains bound by the lower interest cap. *Id.* § 12–404(d)(2).)

those authorized; if the lender's labels are (largely) irrelevant, only part of the sum represents unauthorized charges. Under the former interpretation of the SMLL, none of the seven "non-interest," non-recording fees would be a "loan origination fee," *id.* § 12–405(a)(1), (3), so all would violate the SMLL *in toto.* Under the latter interpretation, lenders could charge (and so denominate) all the "loan origination" fees, "funding" fees, "processing" fees, "express mail" fees, "signing" fees, "sub-escrow" fees, "title exam" fees, "commissions," "points," "discounts," and even "double twilly" fees they wish—so long as they arise from the origination of the loan and do not, in sum, exceed 10% of the net proceeds of the credit extended. All would, in aggregate, constitute a valid, statutory "loan origination fee." The Court need not now decide between the two interpretations, because even if the latter is correct, the Millers have still stated a claim. Ignoring Pacific's labels, the sum total of all the "non-interest," non-recording fees that Pacific charged the Millers is $3,623 (or 11.66% of the net proceeds of the loan), of which $468.74 would represent charges in excess of those allowed.[10]

### b. *Consumer Protection Act*

In bringing their CPA claim, the Millers allege the same conduct on the part of Pacific as does Mr. Gilbert–Iheme in bringing his. They offer the statement of charges itself, and the failure to disclose that their loan was governed by the SMLL. Pl.Opp. 22–23. Just as Mr. Gilbert–Iheme, they do not—and cannot—allege that their loan was used for commercial purposes. For the same reasons that his allegations fail to state a claim

under the CPA, so, too, do theirs. *See supra.*

### c. *Illegal Contract*

 The Millers also seek a declaratory judgment that Pacific's alleged violation of the SMLL renders their mortgage loan void or voidable as an illegal contract against the public policy of Maryland. Compl. ¶¶ 56, 60, 62. Because the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202, is procedural in nature, *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937), in a diversity action such as this, federal, not state, law determines whether a district court may properly render a declaratory judgment, *Nationwide Mut. Ins. Co. v. Welker,* 792 F.Supp. 433, 439 (D.Md.1992). The same pleading standards that apply in other civil actions govern proceedings under the DJA. *Marchese v. Shearson Hayden Stone, Inc.,* 644 F.Supp. 1381, 1386 (C.D.Cal.1986); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1238, at 285 (2d ed.1990). Thus, in seeking a declaratory judgment— just as in seeking any other remedy—a plaintiff must state a claim upon which relief can be granted. Fed.R.Civ.P. 8(a). If a loan made in violation of the SMLL is not void or voidable under Maryland law, then the Millers' complaint fails to state a claim upon which relief can be granted under the DJA.

 Under Maryland law, a contract is illegal if a statute prohibits its formation or performance. *Thorpe v. Carte,* 252 Md. 523, 529, 250 A.2d 618 (1969). Nevertheless, not all contracts that contravene a statute are necessarily invalid. *Beard v. Am. Agency Life Ins. Co.,* 314 Md. 235, 254–55, 550 A.2d 677

---

**10.** The percentage of net proceeds, if represented as *x,* is derived as follows: 3,623 = 0.01*x* (35,000 − 303.14 − 3,623). *See supra* note 8. The overcharge is readily calculated: $3,623 − $3,154.26. *See id.*

(1988); *DeReggi Constr. Co. v. Mate*, 130 Md.App. 648, 663, 747 A.2d 743 (2000). Instead, a court must examine the statute as a whole to determine if the legislature intended that a contract made in violation of its provisions be voided. *Beard*, 314 Md. at 255, 550 A.2d 677.

A close reading of the SMLL reveals no such legislative intent. The statute sets forth very specific penalties. Md.Code Ann., Com.Law II § 12–413. If lenders violate any of its provisions, they are expressly precluded from collecting any interest or other loan charges. *Id.* In addition, if the violation is knowing, lenders must forfeit to borrowers three times the amount of interest and charges collected in excess of that authorized.[11] *Id.* The plain text, at any rate, does not deny even lenders who knowingly violate the law the right to collect the principal they are owed. The intent of the Maryland General Assembly "to guard against usury and other unscrupulous practices and to protect innocent and unsophisticated borrowers" is patent. *Thoreson v. Shaffer*, 111 Md.App. 689, 696, 683 A.2d 1153 (1996). An intent to give borrowers a windfall, this Court does not discern. *See id.* (concluding that the SMLL "is intended as a penalty against the violator as opposed to a benefit for the borrower"). Therefore, the Millers' "illegal contract" claim seeking relief under the DJA must be dismissed.

### B. *Defendants Amaximis, Homeq, Banc One, and Bankers Trust*

### STANDING AND SUBJECT–MATTER JURISDICTION

The question of standing ultimately asks whether litigants are "entitled to have the court decide the merits of the dispute." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In its constitutional dimension, "standing imports justiciability." *Id.* Only if plaintiffs have standing to sue do they present a case or controversy between themselves and the defendants within the meaning of Article III of the Constitution. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Standing, therefore, is a fundamental component of a court's subject-matter jurisdiction. *Id.; Pye v. United States*, 269 F.3d 459, 466 (4th Cir.2001). As such, defendants may aptly challenge its existence by a motion to dismiss for lack of jurisdiction over the subject matter, pursuant to Federal Rule of Civil Procedure 12(b)(1). *Marshall v. Meadows*, 105 F.3d 904, 905–06 (4th Cir.1997). Moreover, resolution of the question of standing necessarily takes precedence over the question whether plaintiffs have stated a claim upon which relief can be granted: without jurisdiction, the court has no power to rule on the validity of a claim. *Steel Co.*, 523 U.S. at 94–95, 118 S.Ct. 1003; *see also Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief can be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction...."); *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

### STANDARD OF REVIEW

There are two ways in which to present a Rule 12(b)(1) motion to dis-

---

11. Criminal misdemeanor penalties, not relevant here, are also prescribed. Md.Code

Ann., Com.Law II § 12–414.

miss for lack of subject-matter jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). Defendants may contend either that the complaint fails to allege facts upon which subject-matter jurisdiction can be based, or that the jurisdictional facts alleged in the complaint are untrue. *Id.* If, as in the instant case, defendants raise the former argument, the plaintiffs enjoy procedural safeguards similar to those they would enjoy when opposing a Rule 12(b)(6) motion. *Id.* The court accepts the plaintiffs' allegations as true, construing them most favorably to the plaintiffs, and relies solely on the pleadings, disregarding affidavits or other materials. *Id.; Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 174 F.Supp.2d 388, 391 (D.Md.2001). The defendants should prevail only if entitled to do so as a matter of law. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

*ANALYSIS*

■ To satisfy the "irreducible constitutional minimum" of standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), plaintiffs must establish three elements: (1) injury in fact; (2) traceability; and (3) redressability. *Id.* at 560–61, 112 S.Ct. 2130; *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir.2000). Plaintiffs satisfy the injury-in-fact requirement if they have suffered an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130; *Friends of the Earth, Inc.*, 204 F.3d at 154. Traceability refers to causation. Plaintiffs must demonstrate that the injury they have suffered was caused by the challenged conduct of the defendants, and not by the independent action of some third party. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130; *Friends of the Earth, Inc.*, 204 F.3d at 154. Finally,

redressability assures the effectiveness of judicial involvement. Plaintiffs must show that it is likely, and not merely speculative, that a favorable decision will remedy the injury. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Friends of the Earth, Inc.*, 204 F.3d at 154.

Although each of the three elements should be examined distinctly, their proof often overlaps. *Friends of the Earth, Inc.*, 204 F.3d at 154. Moreover, all three share a common purpose: to ensure that the judiciary, and not another branch of government, is the appropriate forum in which to address the complaint. *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ Even if the Millers and Mr. Gilbert–Iheme could establish sufficient injury in fact, they fail to satisfy the latter two requirements, traceability and redressability. Fundamentally, none of the plaintiffs alleges any contractual relationship whatsoever with Amaximis, Homeq, Banc One, or Bankers Trust. Indeed, they carefully *avoid* stating that any of these defendants holds their mortgage-secured notes or services their loans. Instead, in their allegations directed specifically at these defendants, the plaintiffs state only that they "[are] (or at one point during the life of the loans w[ere]) ... holder[s] of mortgage notes related to the mortgage loans made by [Pacific] to *Plaintiffs and/or the Class.*" Compl. ¶¶ 8–14 (emphasis added). They never identify them as assignees—past or present—or purchasers of *their* respective notes. Absent a contractual relationship with any of these defendants, the plaintiffs cannot possibly show that their injuries, such as they have suffered, are traceable to the conduct of any of these defendants; nor can they possibly show that a judicial ruling in their favor would likely redress their injuries. Therefore, the plaintiffs lack

standing to sue Amaximis, Homeq, Banc One, and Bankers Trust.

■■■ Their categorization of their suit as a putative class action in no way cures this defect. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ("That a suit may be a class action ... adds nothing to the question of standing...."). Otherwise, any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim. Plaintiffs "may not use the procedural device of a class action to bootstrap [themselves] into standing [they] lack[ ]." *Weiner v. Bank of King of Prussia*, 358 F.Supp. 684, 694 (E.D.Pa.1973).

■■■ Indeed, "it is essential that named class representatives demonstrate standing through a 'requisite case or controversy between themselves personally and [defendants],' not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir.1993) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1001 n. 13, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (citations omitted)) (alteration in original). In a multi-defendant action or class action, the named plaintiffs must establish that they have been harmed by each of the defendants. *See Herlihy v. Ply-Gem Indus., Inc.*, 752 F.Supp. 1282, 1291 (D.Md.1990) (dismissing class action lawsuit because "each plaintiff has not and cannot allege an injury arising from the conduct of each and every defendant").

In *Jackson v. Resolution GGF Oy*, 136 F.3d 1130 (7th Cir.1998), a case whose facts nearly match those here, the Seventh Circuit recently reaffirmed this principle. Plaintiff borrowers brought a putative class action to recover statutory penalties against alleged assignees and purchasers of notes (secured by junior mortgages on their real property) which they had executed with the lender. *Id.* at 1131. One of the defendants, however, though it had bought some of the lender's paper, held none of the notes signed by any of the plaintiffs. *Id.* at 1132. This defendant moved for dismissal on the ground that none of the plaintiffs had standing to pursue a claim against it. *Id.* The court opined: "[The defendant's] position is impeccable. Some other borrowers may have claims against it, but none of these plaintiffs does.... There is no case or controversy between [the defendant] and any of the named plaintiffs, so [the defendant] must be dismissed as a party." *Id.*

Likewise, neither Mr. Gilbert–Iheme nor the Millers have established an actual case or controversy between themselves and Amaximis, Homeq, Banc One, or Bankers Trust. Their class allegations do not and cannot conjure it. Whether the plaintiffs have also failed to state claims against these defendants upon which relief can be granted, this Court has no power to say. *See Steel Co.*, 523 U.S. at 94–95, 118 S.Ct. 1003.

## C. *Defendants MBNA, Household, and Residential*

■■■ MBNA and Household are alleged assignees of Mr. Gilbert–Iheme's loan; Residential is an alleged assignee of the Millers' loan. As assignees, these defendants stand in the shoes of their assignor, Pacific; they are subject to the same claims or defenses as Pacific, unless they can raise a holder-in-due-course defense. *See Jones v. Hyatt*, 356 Md. 639, 653 n. 8, 741 A.2d 1099 (1999). Thus, whatever claims Mr. Gilbert–Iheme may assert against Pacific, he may assert against MBNA and Household. Likewise, whatever claims the Millers may assert against Pacific, they may assert against Residen-

tial. Mr. Gilbert–Iheme, however, has no standing to sue Residential because he alleges no contractual relationship with Residential; nor do the Millers have standing to sue MBNA or Household. *See supra.*

■ Because the statute of limitations bars all of Mr. Gilbert–Iheme's claims against Pacific, his claims against MBNA and Household are also time-barred and must be dismissed. The same limitations defense effective against the assignor is equally effective against the assignees. *Wolfe v. Anne Arundel County,* 135 Md.App. 1, 23, 761 A.2d 935 (2000).

■ Because the Millers have failed to state a claim against Pacific under either the CPA or the DJA, their CPA and DJA claims must also fail against Residential. However, just as their claim under the SMLL survives Pacific's motion to dismiss, it survives Residential's motion to dismiss.

### ORDER

For the foregoing reasons, it is, this 16th day of May, 2002, hereby ORDERED:

1. That the motions of Defendants Amaximis Lending, L.P., Homeq Servicing Corp., Banc One Financial Services, Inc., and Bankers Trust Co. of California, N.A., to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction BE, and they hereby ARE, GRANTED;

2. That the motions of Defendants MBNA America (Delaware), N.A., and Household Finance Corp. to dismiss the complaint of Plaintiffs David and Rosalie Miller for lack of subject-matter jurisdiction BE, and they hereby ARE, GRANTED;

3. That the motion of Defendant GMAC–Residential Funding Corp. to dismiss the complaint of Plaintiff Chima Gilbert–Iheme for lack of subject-matter jurisdiction BE, and it hereby IS, GRANTED;

4. That the motions of Defendants Pacific Shore Funding, MBNA America (Delaware), N.A., and Household Finance Corp. to dismiss the complaint of Plaintiff Chima Gilbert–Iheme for failure to state a claim upon which relief can be granted BE, and they hereby ARE, GRANTED;

5. That the motions of Defendants Pacific Shore Funding and GMAC–Residential Funding Corp. to dismiss Counts II and III of the complaint of Plaintiffs David and Rosalie Miller for failure to state a claim upon which relief can be granted BE, and they hereby ARE, GRANTED;

6. That the motions of Defendants Pacific Shore Funding and GMAC–Residential Funding Corp. to dismiss Count I of the complaint of Plaintiffs David and Rosalie Miller for failure to state a claim upon which relief can be granted BE, and they hereby ARE, DENIED;

7. That the motion of Defendant Pacific Shore Funding to strike Plaintiffs' surreply BE, and it hereby IS, DENIED as mooted by this Order and Memorandum Opinion; and

8. That the Clerk of the Court send copies of this Order and Memorandum Opinion to counsel for the parties.